UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 95-20562
_____


DOROTHY KAHL; BRUCE L. RELKIN,

Plaintiffs-Appellants
Cross-Appellees,

VERSUS

KENNETH R. CASTLEMAN; DONALD WINKLER;
PERCEPTIVE SCIENTIFIC INSTRUMENTS INC.;
PERCEPTIVE SYSTEMS INC.,

Defendants-Appellees,


JAMES L. HURN; EDWARD RANDALL, III; POST OAK BANK,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
For the Southern District of Texas
(CA-H-92-1404)
_____

January 7, 1997


Before REYNALDO G. GARZA, SMITH and DeMOSS, Circuit Judges.

PER CURIAM:[*]

This is a shareholder derivative suit brought by two
disgruntled minority shareholders of a failed corporation. The

_____

[*]Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

shareholders alleged that the company's officers and directors conspired with the company's bank and a prospective buyer to wrongfully foreclose on the company's assets and sell them to the prospective buyer at an unreasonably low price. After a jury verdict partially in favor of the plaintiffs, the district court found that the evidence of damages was insufficient, and granted judgment as a matter of law in favor of the defendants. We agree with the district court that plaintiffs did not present sufficient evidence to support the jury's findings on damages and affirm the district court's grant of judgment as a matter of law.

## BACKGROUND

Plaintiffs-appellants Dorothy Kahl ("Kahl") and Bruce Relkin ("Relkin") (collectively, "Plaintiffs") brought a derivative suit as shareholders of Perceptive Systems, Inc. ("PSI") alleging fraud, breach of fiduciary duty and civil conspiracy against Kenneth Castleman ("Castleman"), Donald Winkler ("Winkler"), James Hurn ("Hurn"), Edward Randall ("Randall"), and Post Oak Bank (the "Bank") (collectively, "Defendants").

Castleman and Winkler are former NASA scientists who founded PSI in 1980 as a privately held company to develop digital imaging equipment for the medical field. Castleman and Winkler served as officers and directors and essentially ran the business. The company began production in 1984. The Bank's relationship with PSI

began in 1987, when it extended the company a $1 million line of credit. The line of credit was secured by PSI's accounts receivable and inventory. By 1990, PSI was having great financial difficulties and the Bank, worried about PSI's condition, decreased the line of credit to $500,000. PSI needed a rapid infusion of capital to survive. In hopes of finding additional funds, PSI enlisted the aid of Hurn, who had previously helped PSI obtain financing.

Hurn introduced Randall, a Houston investor, to PSI. Randall was interested in investing in PSI if the Bank was willing to restructure PSI's outstanding debt. Randall and Hurn negotiated with the Bank, without the participation or knowledge of PSI, for the Bank to loan Randall $200,000. Randall would buy $200,000 of PSI's debt from the Bank for $80,000, and use the other $120,000 to provide capital for PSI. After negotiating with the Bank, Randall, through Hurn, negotiated an agreement with Castleman and Winkler for Randall to receive a debenture, an investment banking fee and a three year consulting fee all payable in PSI stock valued at $0.22/share. Hurn, Castleman, Winkler, and the Bank would also receive warrants to purchase PSI stock for $0.22/share. Randall also asked for Hurn to become a member of PSI's Board of Directors. The shareholders thought that Randall's conditions were too onerous, and rejected his proposal at the December 1990 shareholder

3

meeting.[1] Despite the shareholders' rejection of Randall's plan, Hurn was added to PSI's board at this same time.

In early 1991, PSI was in critical financial trouble. In the six months prior to March 1991, PSI lost over $500,000. The company had less than $70,000 cash on hand, and its $500,000 loan from the Bank was due in full March 15, 1991. The situation at PSI was so bad that the company did not even have funds necessary to file for bankruptcy; instead, it allowed itself to be foreclosed upon.

Plaintiffs allege that, after the Randall proposal was rejected, Defendants conspired to transfer the business of PSI to Randall at an unreasonable price. Defendants allegedly accomplished this by securing a purposeful, but unnecessary, default on PSI's loan from the Bank. Plaintiffs also allege that Defendants pre-arranged for Randall to purchase the secured assets of PSI from the Bank at a private foreclosure sale for an unreasonably low price, to continue the business of PSI as a new company, and to employ Castleman and Winkler in the new company. Plaintiffs further contend that the shareholders were not informed of these actions by the directors and that Hurn, prior to his March 4, 1991 resignation from the Board, was providing inside information to Randall to assist in implementing their plan to transfer the company to Randall against the interests of the

---

[1]Of 6,191,598 shares able to vote, 2,900,063 voted in favor of the plan, while 3,179,769 voted against and 111,766 abstained.

shareholders. In early April 1991, Randall formed a new Texas corporation, Perceptive Scientific Instruments, Inc. ("PSI-2"), and on April 17, 1991, the Bank exercised the power of sale under its Security Agreement with PSI and sold PSI's assets to PSI-2 at a private sale for $200,000. PSI-2 continued the business of PSI, maintaining the same logo, location and employees, including Winkler and Castleman.

Plaintiffs' claims of fraud, breach of fiduciary duty by Winkler, Castleman, and Hurn, and civil conspiracy by all Defendants were tried to a jury. In answers to specific questions, the jury found that:

> (1) Hurn breached his fiduciary duty to PSI, but Castleman and Winkler did not breach any fiduciary duty;
>
> (2) Randall and the Bank participated in Hurn's breach;
>
> (3) Castleman and Winkler did not commit fraud against PSI;
>
> (4) the Bank conducted a commercially unreasonable sale of the assets of PSI;
>
> (5) Randall, Hurn, and the Bank participated in a civil conspiracy with each other, but Castleman and Winkler did not participate in any conspiracy;
>
> (6) Hurn, Randall, and the Bank acted with an intent to injure Plaintiffs or with actual awareness that serious injury to Plaintiffs was highly probable;
>
> (7) Plaintiffs did not waive their right to complain of the conduct of any of Defendants;

5

(8) Plaintiffs were not estopped from complaining of Defendants' conduct;

(9) damages from certain Defendants' breach of duty and conspiracy were $1 million; and

(10) damages from the Bank's conduct in the commercially unreasonable sale were $1 million; and

(11) Plaintiffs were entitled to recover attorney fees based on a percentage of the recovery.

In a subsequent proceeding, the jury awarded Plaintiffs $500,000 in punitive damages against the Bank, but no punitive damages against Randall or Hurn.

The district court, however, entered judgment as a matter of law for all Defendants. The district court concluded that the jury must have valued PSI as a going concern and found that there was no evidence to support the jury's damage finding on that basis. Because there was no evidence of actual damages, the district court held that there could be no punitive damages. Plaintiffs submitted a motion to vacate the judgment, arguing that there was evidence to support the jury's damage award on a going concern value and on the value of PSI's assets.

Eight weeks after the jury was discharged, the district court reconvened the jury and submitted a special interrogatory regarding the basis of the jury's damage award. The jury responded that the award was based on PSI's going concern value. The district court

6

denied Plaintiffs' motion to vacate the judgment after stating that it would have denied Plaintiffs' motion regardless of how the jury responded to the special interrogatory.

## DISCUSSION

### RECONVENING THE JURY

Plaintiffs challenge the district court's decision to reconvene the jury and inquire as to whether it based its verdict on the going concern or asset value theory of damages. Plaintiffs argue that the district court erred in submitting an additional interrogatory regarding the jury's deliberations and method of calculating damages. *See* **Robles v. Exxon Corp.**, 862 F.2d 1201, 1204 (5th Cir. 1989), *cert. denied*, 490 U.S. 1051, 109 S. Ct. 1967 (1989).[2] We need not address the propriety of the district court's conduct, however, because the evidence of damages is insufficient under both the going concern and asset value theories.

### DAMAGES

Plaintiffs challenge the district court's entry of judgment as

---

"Although the court may resubmit special interrogatories to a jury prior to discharge if the jury's original answers to the interrogatories are irreconcilably inconsistent, FED. R. CIV. P. 58(2) and the seventh amendment command that judgment be entered on the verdict if the jury's answers are clear and consistent, subject, of course, to the usual motions under rules 50 and 59 for judgment notwithstanding the verdict or a new trial." *Id.; see also* FED. R. EVID. 606(b) (barring "inquiry into the thought processes of jurors").

a matter of law, arguing that ample evidence supports the jury's award of damages.  We review judgments as a matter of law *de novo*. **EEOC v. Louisiana Office of Community Services**, 47 F.3d 1438 (5th Cir. 1995).  Affirming a judgment as a matter of law is appropriate:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict .... On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.

*Id*. at 1443, *citing* **Boeing Co. v. Shipman**, 411 F.2d 365, 374 (5th Cir. 1969) (en banc).  We consider all the evidence and draw all reasonable inferences in support of the jury's verdict. **Fontenot v. Cormier**, 56 F.3d 669, 673 (5th Cir. 1995).  We will reverse the judgment as a matter of law "[i]f a rational jury could have concluded as the jury did." **Pierce v. Texas Dep't Crim. Justice**, 37 F.3d 1146, 1149 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1957 (1995).

In this diversity case, we apply Texas substantive law.  Texas law requires that economic damages be proved with "reasonable certainty."  **Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.**, 877 S.W.2d 276, 279 (Tex. 1994)

8

*Going Concern Value of PSI*

We first analyze the evidence to determine if it is sufficient to support damages based on a valuation of PSI as a going concern. Because Plaintiffs' claim is that Defendants conspired to sell PSI for less than its full value at the foreclosure sale, our inquiry is limited to whether the evidence is sufficient to determine PSI's value on the day of the foreclosure sale.

*December 1990 Valuation of Warrants*

Plaintiffs allege that Defendants themselves valued PSI at $0.22/share four months prior to the foreclosure in the context of Randall's December 1990 proposed financing. As a part of the plan, Randall, Hurn, the Bank, Castleman, and Winkler were to receive warrants to purchase PSI stock for $0.22/share. There was also evidence that PSI's shareholders informed Castleman that the shareholders should have been offered the opportunity to purchase stock for $0.22/share. Given the number of shares outstanding, Plaintiffs contend that this would place PSI's value at approximately $1.6 million.

It is important to note that this valuation is based on a transaction that never occurred. Under Texas law, evidence of an unconsummated transaction has little, if any, probative value. ***Southwestern Bell Tel. Co. v. Wilson***, 768 S.W.2d 755, 762 (Tex. App.--Corpus Christi 1988, writ denied) ("Unaccepted offers to

9

purchase are not competent evidence of fair market value.") (citing *Hanks v. Gulf, Colo. & S.F. Ry*., 320 S.W.2d 333, 336 (Tex. 1959)).

Additionally, Randall's offer was not a present offer to buy PSI stock for $0.22/share. Instead, as part of their complex financing arrangement, Randall and the other Defendants were to receive warrants to purchase PSI stock at this price within the next five years. Thus, Defendants would merely receive the right to purchase PSI stock for $0.22/share if, within the next five years, they thought the stock was worth that amount. If the warrant holders never determined that the shares were worth $0.22/share, they would simply allow the warrants to expire and have no liability for not exercising the warrants.

Because the right to purchase stock at a set price in the future is not evidence of the value of the stock in the present, evidence of the warrant price is insufficient to support the jury's award of damages.

### Actual Sales of PSI Stock

Between 1987 and 1989, shares of PSI capital stock were privately sold for prices ranging from $1.00/share to $1.50/share. Given PSI's 7.3 million shares of outstanding stock, Plaintiffs contend this demonstrated a valuation between $7.3 million and $10.95 million. Plaintiffs also point to Hurn's compensation for

10

his efforts in raising capital for PSI in the Summer of 1989. Hurn received cash and PSI stock which was valued at $1.18/share. At $1.18/share, the company's value would be $8.5 million.

Stock sales from 1989 and before are too remote to provide sufficient evidence of PSI's value in April 1991. *See* **City of Amarillo v. Betts**, 429 S.W.2d 685, 687 (1968--Tyler, no writ) (evidence of rental value of property two years prior to valuation date is not "competent evidence of the market value of the property [on the valuation date]. **It is too remote in point of time**." (emphasis added)); **Thompson v. State**, 319 S.W.2d 368, 371 (1958--Waco, no writ). While it is possible some companies could be valued with evidence of almost two-year-old stock sales, this is not the case with PSI. The evidence is clear that PSI was in dire financial straits and losing value rapidly at the time of the Bank's foreclosure. Therefore, this remote evidence is not "evidence of such quality and weight" as to form the basis for the jury's award of damages. **EEOC v. Louisiana Office of Community Services**, 47 F.3d 1438, 1443 (5th Cir. 1995).

### Valuations Concerning Failed Initial Public Offerings

At a PSI board meeting in February 1989, the directors approved a letter of intent from Reich & Co., an investment banking firm, in connection with a planned initial public offering that

valued the company at between $18.5 million and $22 million.

As with the stock sales discussed above, this evidence of PSI's value is too remote to support a verdict. Additionally, the public offering never occurred because the underwriters became convinced that PSI was overvalued. The probative value, if any, of this remote valuation is significantly diminished due to the underwriters' belief that PSI was overvalued.

### Merger Negotiations

Plaintiffs point to evidence that PSI was valued between $11-$12 million based on early 1990 merger negotiations with Betagen, another high-technology company. Due to PSI's rapidly diminishing value, the over one-year-old valuation by Betagen is too remote to provide sufficient evidence of damages.

Plaintiffs also rely on merger negotiations with another high-technology company, IRIS, in November 1990 that would have valued PSI at $3.3 million. Time wise, this valuation is more relevant, coming within six months of the foreclosure sale. Nonetheless, the evidence is clear that PSI's value dropped substantially during those six months. Additionally, as discussed above, under Texas law, the evidentiary value of unconsummated transactions is quite limited. *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 762 (Tex. App.--Corpus Christi 1988, writ denied). Accordingly, this six-month old valuation in regards to a failed merger is

12

insufficient to support the verdict.

### Bridge Financing Valuations

Plaintiffs also point to valuations of PSI made in the Spring of 1990 by Venkol, an investment fund. In connection with a proposed bridge loan, Venkol valued PSI at $2.6 million. As discussed above, given PSI's rapidly declining value, evidence concerning PSI's value made a year before the foreclosure sale is too remote to support a jury verdict.

### Market Multiple

Plaintiffs point to evidence that, during negotiations with Randall in connection with the December 1990 proposal, Castleman valued PSI at one time its annual revenue, or $2.6 million. Plaintiffs presented no expert or other evidence as to why PSI should be valued at its annual revenue. Because PSI never made a profit, evidence of its revenue has little correlation to its value. This evidence is insufficient to support the verdict.

### Expert Valuation of PSI

Plaintiffs' expert witness, Robert J. Moore, testified that PSI was worth $8 million at the time of the foreclosure sale. Moore estimated PSI's value using both the "market approach," which calls for comparing PSI to comparable publicly traded companies,

and the "income approach," which calls for projecting future income and discounting it to present value. Assuming adequate capital would be available to PSI, Moore calculated a range of values between $4 million and $26 million using the market approach and a value of $6.6 million using the income approach. Based on these estimates, Moore opined that PSI was worth $8 million just before the foreclosure sale in April 1991. The trial court concluded that Moore's assumption that adequate capital would be available to PSI was not supported by substantial evidence.

There is some evidence in the record regarding the availability of short term financing. That evidence, however, is insufficient because it is clear that the offer of this financing was contingent on facts that would not and did not occur. Thus, the offer of short term financing was illusory. There is no evidence in the record that PSI had access to long term capital.

Dr. Samuel Herschkowitz, a venture capitalist and PSI shareholder, testified that he offered PSI $150,000 in short term, or bridge, financing. A review of Herschkowitz's testimony shows that this was not a legitimate offer of capital because it was contingent on an accountant's opinion that $150,000 would be sufficient to meet PSI's capital needs, and no accountant could or did give such an opinion.

Moore's valuation of PSI was contingent on available capital. An expert's opinion is not sufficient evidence when it is based

14

upon unsupported assumptions. *See In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234-35 (5th Cir. 1986); *Genmoora Corp. v. Moore Business Forms, Inc.*, 939 F.2d 1149, 11579 (5th Cir. 1991) ("An expert's testimony will not support a verdict if it lacks an adequate foundation in the facts of the case."). Because the evidence is insufficient to prove that PSI had access to additional working capital, the evidence is insufficient to support Moore's going concern valuation of PSI.

*Asset Value of PSI*

Plaintiffs claim that PSI's assets were worth $1.112 million at the time of the foreclosure sale. Inventory as of February 1991 was valued at $734,317.28, and Castleman testified that inventory sold in the normal course of business could net an amount near that reflected on the balance sheet. Accounts receivable were $313,305 and Castleman testified that PSI's accounts had historically been collectable. Cash on hand as of February 1991 was $64,380.22.

The evidence clearly established that PSI's debts far exceeded its assets. Absent consideration of liabilities, evidence of a company's assets is meaningless. *ITT Commercial Finance Corp. v. Riehn*, 796 S.W.2d 248, 255 (Tex. App.--Dallas 1990, no writ) ("[A] debtor has no right to affirmative relief unless he can show that the fair market value of the collateral at the time of taking exceeded the unpaid balance of the indebtedness...."); *Food City,*

15

*Inc. v. Fleming Cos., Inc.*, 590 S.W.2d 754, 761 (Tex. Civ. App.--San Antonio 1979, no writ).

PSI's balance sheet as of February 28, 1991, shows current liabilities of $1,307,448.51 and long term liabilities of $314,184.48. These liabilities include $556,524.26 in notes to the Bank, a $250,000 note to SBI Capital and $314,742.92 in accounts payable. Considering PSI's assets of $1.112 million and its liabilities of $1,621,632.99, the company had no value.

## CONCLUSION

After reviewing the record, we are convinced that the evidence is insufficient to support the damage award to Plaintiffs. As discussed above, Plaintiffs' multiple valuations of PSI are all defective. Most are too remote in time to provide sufficient evidence of the company's value on the day of the foreclosure sale. Other valuations are deficient because Plaintiffs' expert testimony was based on an assumption not supported by the evidence. Because the evidence of damages is insufficient to support the jury's verdict, we **AFFIRM** the district court's grant of judgment as a matter of law in favor of Defendants.[3]

---

[3]Because we hold that the evidence is insufficient to support the damage award against Defendants, we need not opine as to the sufficiency of the evidence as to liability.

17